Lynnette Warman
Tex. Bar No. 20867940
Richard G. Grant
Tex. Bar No. 08302650
CULHANE MEADOWS, PLLC
The Crescent, Suite 700
100 Crescent Court
Dallas, Texas 75201
Telephone: 214-693-6525
Facsimile: 214-361-6690
Email: lwarman@culhanemeadows.com
Email: rgrant@culhanemeadows.com

PROPOSED ATTORNEYS FOR
DEBTOR IN POSSESSION

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 15-40248-11 |
| GTL (USA), INC., | § | Chapter 11 |
| | § | |
| Debtor. | § | |

### DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO OBTAIN CREDIT SECURED BY CASH DEPOSITS UNDER 11 U.S.C § 364(C)(2)

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

GTL (USA), Inc., the debtor and debtor-in-possession (the "Debtor") in the above captioned case, hereby files this Debtor's Emergency Motion for Authority to Obtain Credit Secured by Cash Deposits Under 11 U.S.C § 364(c)(2)  (the "Motion") and respectfully states as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Application is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Introduction

2.        On February 9, 2015 (the "Petition Date"), the Debtor commenced its

reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy

Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"). To date, no creditors' committee has

been appointed in this case. The Debtor continues in possession of its property and operation of

its business, as debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy

Code.

3.        The statutory predicates for the relief requested herein are sections 105(a), 363(b)

and 364(c) of title 11 of the Bankruptcy Code.

## Discussion

4.        In the ordinary course of business, the Debtor has service technicians and drivers[1]

that travel among locations required by customers to measure signal strength of mobile network,

cell towers and other related network equipment to support the network infrastructure of

customers such as Nokia and Ericsson. The Debtor pays for the fuel, car rental, travel, lodging,

room and board of the service technicians and drivers.

5.        Prior to the Petition Date, the Debtor had unsecured credit facilities with WEX

Bank (fuel), Universal Premium (fuel), Extended Stay America (Lodging) and American Express

(airlines, room and board) to provide for the logistics of paying for such travel expenses. Each of

these facilities was typically paid by autodebits from the Debtor's bank account.

6.        The providers of each of the foregoing prepetition credit facilities have terminated

postpetition advances. The credit providers are no longer willing to provide postpetition credit to

the Debtor on an unsecured basis as contemplated by Bankruptcy Code Section 364(a).  The

---

[1] The technicians and drivers are employed, either through the Debtor's Professional Employment Organization provided by Insperity, or by various subcontractors and staffing companies.

credit facility providers appear to only be willing to provide postpetition credit to the Debtor to the extent secured by cash on deposit with the credit facility provider.

7.      The Debtor has been working with these prepetition credit providers to reestablish credit terms on a postpetition basis. In addition, the Debtor has identified new and/or backup credit providers to supplement the prepetition group of convenience credit providers, to wit: Global Fleet (fuel), Creative Lodging Solutions (lodging) and Wells Fargo Bank (secured business credit card).

8.      Due to the pendency of the Debtor's Chapter 11 case, the convenience credit providers are requiring cash deposits to secure the proposed postpetition convenience credit facilities.  The Debtor seeks general authority by this motion to obtain credit and incur debt pursuant to 11 U.S.C. §364(c)(2) secured by property of the estate (cash deposits) that is not otherwise subject to a lien up to a maximum amount of $300,000.

9.      The Debtor has not yet made final decisions as to which combination of credit providers is the most desirable and continues to negotiate with the various providers.  However, the amount of the cash deposit is generally equal to the amount of anticipated credit to be utilized by the Debtor. The Debtor contemplates amounts such as the following:

| | | |
|---|---|---|
| a. | WEX Bank (fuel): | $25,000-$35,000 |
| b. | Universal Premium (fuel): | $5,000-$10,000 |
| c. | Global Fleet – WEX FSC (fuel): | $10,000-$15,000 |
| d. | Extended Stay America (lodging): | $50,000-$60,000 |
| e. | Creative Lodging Solutions (lodging): | $25,000-$35,000 |
| f. | WEX Bank (MasterCard) | $75,000 |
| g. | American Express (general credit): | $50,000-$75,000 |
| h. | Wells Fargo (general credit): | $100,000. |

10.     The credit agreements all generally contemplate a deposit of cash with the provider that is held on deposit subject to the security interest of the provider.  Billing for charges are issued monthly and immediately paid by the Debtor.  In the event of a nonpayment in full, the provider would apply the deposit to the outstanding amount and terminate the facility.

11.     Some of these credit providers (e.g. WEX Bank, Global Fleet) have provided the forms of agreement required.  Exemplars of such agreements are attached hereto as **Exhibit B**.

12.     To maintain flexibility in the creation and modification of these agreements, including the possible waiver or elimination of the deposit requirement, the Debtor requests general authority to enter into, modify and terminate these types of arrangements as may be called for in the Debtor's business judgment.  However, the Debtor would be limited to a maximum aggregate deposit of $300,000 absent further Court approval.

**Alternatives**

13.     The Debtor has investigated the wisdom of utilizing other methods to pay for the described services, including debit cards to the Debtor's DIP bank accounts, a traditional invoice/check payment system, and requiring employees to incur the expense on their personal credit card and then submit the same for reimbursement.  In the Debtors' management's business judgment, each of these methods is less desirable.

14.     *Alternative 1: Debit Cards*. The Debtor has determined that utilizing a company debit or ACH directly to the debtor-in-possession operating account is not a secure method of payment and has the potential for abuse.  In the comparison, using a secured general credit card facility with American Express, WEX Bank, or Wells Fargo provides for unique credit cards to be issued to each technician. In the event of misuse of the credit card, the credit card facility

allows for the notice of termination of the card. The credit provider will then issue a credit for any inappropriate chargers.

15.     *Alternative 2: Invoice/Check*.  The debtor has also considered using a traditional invoice and pay by check method. However to stay competitive in the market, this method is too cumbersome, resulting in inability of technicians to travel efficiently.  In cases of airline tickets, individual hotels, or boarding expenses, the method is simply not possible.

16.     *Alternative 3: Employee Advance to Debtor*.  The Debtor has also considered requiring the technicians to advance funds for travel expenses and submit expenses for reimbursement. This method has not been used historically by the Company because either (a) technicians do not have either the willingness or ability to utilize their personal credit card to cover the travel charges incurred or (b) utilizing a credit card facility is simply a much more efficient method to track and pay charges.

### Relief Requested

17.     For the foregoing reasons, the Debtor requests the Court to authorize the Debtor to enter into and/or modify one or more short term credit, deposit or other agreements with convenience credit providers as may be required by such provider upon terms as the Debtor, in its reasonable business judgment, deems appropriate, all to a maximum amount of $300,000 in the aggregate.

18.     In addition, WEX Bank, one of the providers, has required that the prepetition amounts due them ($1,823.24) be paid as a condition to the postpetition credit facility with WEX Bank.  The Debtor requests authority to pay this prepetition amount as a critical vendor payment.

### Basis for Relief

**Payment of the Pre-Petition Amount**

19.     The goods and services provided by the Credit Providers directly relate to the Debtor's operations, involve a vendor who is the sole local provider of a this service, is the only supplier willing to extend credit to the Debtor, or has such superiority over competitive products or services that switching to the competitor would be as destructive to the Debtor's business as no vendor at all, and are critical to Debtor's operations, the delay of which could involve costs exceeding the pre-petition amounts proposed to be paid. Further it would prevent disruption to the ongoing operations of the Debtor. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

20.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the Debtors is not a novel concept." *In re Ionosphere Clubs, Inc*., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). "Under section 105, a court can permit pre-plan payment of prepetition obligations when essential to the continued operation of the debtor." *In re NVR L.P*., 147 B.R. 126, 127 (Bankr. E.D.Va. 1992). The Debtor strongly believes that the uninterrupted supply of the credit cards provided by the Credit Providers is imperative to the ongoing operations and viability of the Debtor.

21.     The "necessity of payment" doctrine further supports the relief requested herein. This doctrine recognizes the existence of the judicial power to authorize the Debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor. *Ionosphere Clubs*, 98 B.R. at 176; see also *In re Chateaugay Corp*., 80

B.R. 279 (S.D.N.Y. 1987). This doctrine is consistent with the paramount goal of chapter 11 -

"facilitating the continued operation and rehabilitation of the debtor . . ." *Ionosphere Clubs*, 98

B.R. at 176. Accordingly the Debtor believes the payment of the Pre-Petition Amount to WEX is

essential and appropriate.

22.     The Debtor submits that nothing in this Motion is intended or should be construed

as: (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the

Debtor's rights to dispute any claim; or (c) an approval or assumption of any agreement, contract

or lease, pursuant to section 365 of the Bankruptcy Code.

**The Deposit Agreement**

11.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1). The use, sale or lease of property of the estate, other than in

the ordinary course of business, is authorized when there is a "sound business purpose" that

justifies such action. *See Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In

re Cont'l Airlines),* 780 F.2d 1223, 1225-26 (5th Cir. 1986); *Comm. of Equity Sec. Holders v.

Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983); *In rePhoenix Steel Corp.,*

82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval under section 363 of

the Bankruptcy Code requires a showing that the proposed action is fair and equitable, in good

faith and supported by a good business reason); *In re 240 North Brand Partners, Ltd.,* 200 B.R.

653, 659 (9th Cir. B.A.P. 1996); *Walter v. Sunwest Bank (In re Walter),* 83 B.R. 14, 19 (9th Cir.

B.A.P. 1988).

12.     The business judgment rule is a "policy of judicial restraint born of the

recognition that directors are, in most cases, more qualified to make business decisions than are

judges." *International Ins. Co. v. Johns,* 874 F.2d 1447, 1458 n.20 (11th Cir. 1989); *See also*

*F.D.I.C. v. Castetter,* 184 F.3d 1040, 1044 (9th Cir. 1999) ("The general purpose of the business

judgment rule is to afford directors broad discretion in making corporate decisions and to allow

these decisions to be made without judicial second-guessing in hindsight."). In that regard,

"[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a

decision made arbitrarily or capriciously), courts will generally not entertain objections to the

debtor's conduct." *See Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re

Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). When a valid business

justification exists, the law vests the debtor's decision to use property out of the ordinary course

of business with a strong presumption that "in making a business decision the directors of

acorporation acted on an informed basis, in good faith and in the honest belief that the action

taken was in the best interests of the company." *See Official Comm. of Subordinated

Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y.

1992) (citations and internal quotations omitted), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

13.    The Debtor submits it is an exercise of sound business judgment to obtain the

credit described herein. Failure to do so could result in significant disruption to the Debtor's

business operations by hampering the Debtor's ability to timely and promptly service the needs

of its customers.

14.    Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise

of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured

credit and the borrowing is in the best interests of the estate. Pursuant to section 364(c), if a

debtor cannot obtain post-petition credit on an unsecured basis, a court may authorize such

debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status,

secured by a senior lien on unencumbered property or secured by a junior lien on encumbered

property. 11 U.S.C. § 364(c).

15.     Section 364(c) of the Bankruptcy Code provides, in pertinent part,

that:

> (c) If the trustee [or debtor in possession] is unable to obtain unsecured credit
> allowable under section 503(b)(1) of this title as an administrative expense, the
> court, after notice and a hearing, may authorize the obtaining of credit or the
> incurring of debt; (1) with priority over any and all administrative expenses of the
> kind specified in section 503(b) and 507(b) of this title; (2) secured by a lien on
> property of the estate that is not otherwise subject to a lien; or (3) secured by a
> junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

16.     The credit providers have cut off the preexisting prepetition credit facilities of the

Debtor and will not reinstate credit unless the Debtor enters into secured credit deposit

agreements. The Debtor unsuccessfully attempted to make alternative arrangements to obtain

post-petition credit on an (a) unsecured basis pursuant to sections 364(a) and (b) of the

Bankruptcy Code or (b) unsecured superpriority basis pursuant to section 364(c) of the

Bankruptcy Code.

17.     A debtor seeking to incur secured debt under section 364(c) of the Bankruptcy

Code must make a reasonable effort to seek other sources of unsecured debt, but is granted

deference in acting in accordance with its business judgment and, indeed, is not required to seek

credit from every possible source. *See, e.g., In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40

(Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable

efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor

approached four lending institutions, was rejected by two and selected the least onerous

financing option from the remaining two lenders); *see also Bray v. Shenandoah Fed. Sav. &
Loan Assoc. (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes

no duty to seek credit from every possible lender before concluding that such credit is unavailable"). Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.,* 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames,* 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

18.     The Debtor has attempted to make alternative arrangements to obtain postpetition credit on an (a) unsecured basis pursuant to sections 364(a) and (b) of the Bankruptcy Code or (b) unsecured superpriority basis pursuant to section 364(c) of the Bankruptcy Code but were unsuccessful in finding any alternative arrangement that would adequately service the Debtor's needs on as competitive a basis.

19.     Accordingly, the Debtors believe granting the relief requested herein is the best available option at this time.

### *Notice*

20.     No trustee, examiner, or creditors' committee has been appointed in this case. A copy of this Motion has been served on the parties described in Local Rule 9013(f)(1)(B).  The Debtor submits that no other or further notice need be provided.

*Conclusion*

21.    Accordingly, the Debtor requests that the Court enter an order in the form attached

hereto as **Exhibit A** and awarding the Debtor any further relief the Court deems appropriate.

Dated: March 2, 2015                              Respectfully Submitted,

                                         CULHANE MEADOWS, PLLC


                                         By:    /s/ Lynnette Warman
                                                Lynnette Warman
                                                Tex. Bar No. 20867940
                                                Richard G. Grant
                                                Tex. Bar No. 08302650
                                         The Crescent, Suite 700
                                         100 Crescent Court
                                         Dallas, Texas 75201

                                         Telephone: 214-693-6525
                                         Facsimile: 214-361-6690
                                         Email: rgrant@culhanemeadows.com
                                         Email: lwarman@culhanemeadows.com

                                         PROPOSED ATTORNEYS FOR DEBTOR
                                         IN POSSESSION


<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that he has transmitted a true and correct copy of the
foregoing via the Court's Electronic Case Filing system to all persons participating therein on
March 1, 2015 and via United States First Class Mail, postage prepaid, to each of the addresses
on the attached service list.

                                              /s/ Richard Grant
                                         Richard G. Grant

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 15-40248-11 |
| GTL (USA), INC., | § | Chapter 11 |
| | § | |
| Debtor. | § | |

**ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR
AUTHORITY TO OBTAIN CREDIT
SECURED BY CASH DEPOSITS UNDER 11 U.S.C § 364(C)(2)**

Upon consideration of the Debtor's Emergency Motion for Authority to Obtain Credit

Secured by Cash Deposits Under 11 U.S.C § 364(c)(2) (the "Motion") filed by GTL (USA), Inc.

(the "Debtor"),[1] as debtor and debtor-in-possession, the Court finds that (a) it has jurisdiction to

consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(b)(2) and

1334; (b) venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (c) due and

proper notice of the Motion has been provided and no other or further notice need be provided;

and (d) the relief requested in the Motion is in the best interests of the Debtor, its estate, and

creditors.  The Court, having reviewed the Motion and having heard the statements in support of

the relief requested therein at a hearing before this court, the Court determines that the legal and

factual bases set forth in the Motion and at the hearing establish just cause for the relief granted

herein.

**IT IS THEREFORE ORDERED** that the Motion is GRANTED as provided herein.

**IT IS FURTHER ORDERED** that the Debtor is authorized to enter into, modify,

terminate and incur debt pursuant to one or more short term credit, deposit or other agreements

(the "Agreements") with convenience credit providers selected by the Debtor (the "Credit

---

1 Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

Providers") as may be required by such providers upon terms as the Debtor, in its reasonable business judgment, deems appropriate, all to a maximum amount of $300,000 in the aggregate.

  **IT IS FURTHER ORDERED** that pursuant to sections 363(b) and 364(c) of the Bankruptcy Code, the Debtor is authorized to enter into the Agreements and deposit unencumbered cash with the with Credit Providers and make borrowings thereunder, all as contemplated by the Agreements and take such other action as may be necessary or appropriate to implement and effectuate the transactions contemplated therein;

  **IT IS FURTHER ORDERED** the Collateral shall secure all of the Debtor's obligations under the Deposit Agreement and shall be senior to the security interest or lien of any other party claiming an interest in the Collateral.

  **IT IS FURTHER ORDERED** that the Debtor may pay WEX Bank the amount of $1,823.24 provided, however, that nothing in this Order is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's rights to dispute any claim; or (c) an approval or assumption of any agreement, contract or lease, pursuant to section 365 of the Bankruptcy Code.

  **IT IS FURTHER ORDERED** that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this order.

*Submitted by:*

Lynnette Warman
Tex. Bar No. 20867940
Richard G. Grant
Tex. Bar No. 08302650
CULHANE MEADOWS, PLLC
The Crescent, Suite 700
100 Crescent Court
Dallas, Texas 75201
Telephone: 214-210-2929
Facsimile: 214-210-2949
Email: rgrant@culhanemeadows.com

PROPOSED ATTORNEYS FOR
DEBTOR IN POSSESSION

**EXHIBIT B**

## DEPOSIT AGREEMENT

THIS AGREEMENT is made by and between **WEX Bank ("WEX Bank")**[1], a Utah industrial bank with a place of business at 7090 Union Park Center, Suite 350, Midvale, UT 84047 and _____ with a place of business at _____ (the "Customer") and it shall become effective as of the date set forth below.

**WHEREAS**, the Customer intends to make credit card purchases using a WEX Bank issued charge card; and

**WHEREAS**, WEX Bank has agreed to establish or has established a credit line (the "credit line") for Customer on the condition that the Customer deposit cash collateral with it to be held by WEX Bank as security for any and all obligations owing by the Customer to WEX Bank arising on or after the date hereof.

**NOW, THEREFORE**, the parties hereto agree as follows:

1. The Customer shall deposit with WEX Bank the sum of $_____ (the "deposit"), the receipt of which is hereby acknowledged and the Customer does hereby grant to WEX Bank a security interest in said deposit and in all credits or other amounts owing from WEX Bank to the Customer, all in order to secure any and all obligations owing by the Customer to WEX Bank arising on or after the date hereof.

2. WEX Bank shall record the deposit and any additional deposit on its books, but shall not be required to segregate the sum from its other funds.  WEX Bank may, at its sole discretion and without notice, apply said deposit and any additional deposit, or so much thereof as is necessary, to satisfy any obligations including any outstanding account balances arising on or after the date hereof from the Customer to WEX Bank.  WEX Bank shall also have a right to set off with respect to any credits or other amount owing by WEX Bank to the Customer.

3. If at any time the Customer ceases to become a WEX Bank card holder, and all of the Customer's accounts have been paid in full and no further amounts are owed from the Customer to WEX Bank, then the remaining deposit amount shall be returned by WEX Bank to the Customer.

4. The Customer agrees that it will pay amounts owed for credit card purchases made using a WEX Bank issued charge card as such amounts become due and in accordance with credit terms established from time to time by WEX Bank.  Nothing herein contained shall relieve the Customer of its obligation to make such payments as they come due.

5. This Agreement shall be governed by and construed in accordance with federal law and the laws of the State of Utah (without reference to choice of law rules).

6. This Agreement sets forth the entire understanding and supersedes any previous understandings or agreements, written or oral, between the parties relating to the subject matter hereof.  This Agreement may be modified only by an agreement in writing signed by both parties.

**By signing this Deposit Agreement you are indicating that you have the authority to bind the Customer to this Deposit Agreement and to the terms contained herein.**

**CUSTOMER NAME:** _____

**Customer's Physical Address:** _____

**Customer's Telephone Number:** _____

**Authorized Signature:** _____   **Printed Name:** _____

**Title of Signatory:** _____   **Date:** _____

**Return this Agreement and Certified Check to:**
WEX Bank, 7090 Union Park Center, Suite 350, Midvale, UT 84047

[1] References to WEX Bank in this Agreement are also intended to refer to any entity to whom WEX Bank assigns its rights as allowed under any credit agreement between the parties.

**For Internal Use Only:**

| Account Number(s) | | |
|---|---|---|

DEP.AGR (1/13)

# GLOBAL-FLEET FUEL CARD ACCOUNT APPLICATION

1) The undersigned applicant/buyer ("Applicant") represents that the information given in this application is complete and accurate and authorizes Card Issuer to check with credit reporting agencies, credit references and other sources disclosed to confirm information given; 2) Applicant requests a business charge account, if approved for credit, and one or more business charge cards from the card issuer, which is Wright Express Financial Services Corporation ("Card Issuer"); 3) Applicant agrees to the terms and conditions set forth in the Business Charge Account Agreement provided with this application and/or provided with the business charge card(s). Use of any card issued pursuant to this application confirms Applicant's agreement to said terms and conditions; 4) If this Account is for a partnership or a proprietorship, a partner or principal must sign this application and the undersigned's personal credit will be used in making a credit decision and they hereby authorize Card Issuer to obtain a consumer report. In the event that this application is denied based upon information contained in a consumer credit report of the undersigned, they authorize the Card Issuer to report the reason for the denial to the Applicant. Direct inquiries of businesses where the undersigned maintains accounts may also be made; 5) Applicant agrees that in the event the account is not paid as agreed, Card Issuer may report the undersigned's liability for and the status of the account to credit bureaus and others who may lawfully receive such information. 6) By providing the phone numbers below, you authorize us to contact you at any of these numbers regarding this application or any account opened as a result of this application. If you have any questions regarding this application, please call 1-800-903-5338.

| Full Legal Company Name of Applicant/Buyer | Phone # | Fax# |
|---|---|---|
|  |  |  |

Write company name as you wish it to appear on cards. Limit of 20 characters including spaces. Unless specified, no company name will appear on cards.

|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| DBA or AKA | Subsidiary of | Applicant's Taxpayer ID # (TIN, FEIN or SSN) |
|---|---|---|
|  |  |  |

| Business Physical Address and Phone # (Do not include PO Box) | SIC Code or Type of Business |
|---|---|
|  |  |

| Billing Contact | Billing Address | City | State | Zip+4 |
|---|---|---|---|---|
|  |  |  |  |  |

| Principal(s)/Authorized Officer(s) | Title(s) |
|---|---|
|  |  |

| In Business Since (yyyy) | Year of Incorporation (yyyy) | Fiscal Year Start (mm) |
|---|---|---|
|  |  |  |

| Number of Vehicles for this program | Avg Monthly Fuel Expenditures $  Deposit Amt | Avg Monthly Service Expenditures (Required for optional service acceptance.) $ |
|---|---|---|
|  |  |  |

**Complete this Section Accurately. Select One:** ☐ Corporation   ☐ Partnership   ☐ Proprietorship   ☐ PC or PA   ☐ LLC
**Is this account for a company that has been incorporated less than three years, a partnership, a proprietorship, a professional corporation or association, or a limited liability company?** ☒ No   ☐ Yes (If YES, complete and attach the Personal Guaranty on page 2.)

Designate the person authorized to receive all charge cards, reports, and other such information we provide from time to time and to take actions with respect to your account and account access. This is also the person designated by your company to receive all fleet vehicle, driver and other information we may request. By signing below, you also (i) designate representatives from your card program sponsor ("Sponsor") to have access to your account information in order to facilitate customer service and account maintenance requests on your behalf, and (ii) authorize the Card Issuer to accept account maintenance requests and other instructions from Sponsor on your behalf.

| Authorized Contact Name | Title | Phone # | Fax # |
|---|---|---|---|
|  |  |  |  |

| Mailing Address (if different from billing address) | City | State | Zip+4 |
|---|---|---|---|
|  |  |  |  |

| Email address |
|---|
|  |

☐ Check here if business is exempt from motor fuels tax (sales representative will provide further details)

INFORMATION SHARING DISCLOSURE: CSI Enterprises, Inc., Card Issuer or its affiliates may, to the extent allowed by law, share information disclosed by or generated as a result of this application with each other, and with merchants accepting the card. In addition, information regarding your transactions may be provided to accepting merchants or their service providers to facilitate discounts or other promotional campaigns of interest to you.

**Program Costs:** $0   one-time account setup fee and $2.00 per card, per month.
**Instructions: Complete and sign application. To speed processing, fax your application to us at** 877-900-2892

## AUTHORIZED SIGNATURE REQUIRED

Any person signing on behalf of a business attests that the Applicant is a valid business entity, that, if applicable, the execution of this application has been duly authorized by all necessary action of Applicant's governing body, and that the undersigned is authorized to make this application on Applicant's behalf.

| Signature   X | Date | Print Name | Title |
|---|---|---|---|
|  |  |  |  |

## FOR OFFICE USE ONLY

| Opportunity Number | Sales Code | Plastic GFF1 | Coupon Code | Account Number 0496 |
|---|---|---|---|---|

Our bank complies with Federal law which requires all financial institutions to obtain, verify, and record information that identifies each company or person who opens an account. What this means for you: when you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents for your business.

# GLOBAL FLEET CARD BUSINESS CHARGE ACCOUNT AGREEMENT

1. DEFINITIONS:  In this Business Charge Account Agreement (the "Agreement"), the following words have the following meanings:

**"Account(s)"** means your credit account(s) maintained with WEX FSC. An Account may be evidenced by a plastic card or an account number.

**"Business Day"** means any day other than a Saturday or Sunday or other day on which Federal banking institutions are generally authorized or required by law or executive order to close.

**"Card"** means a charge card or an account number issued by WEX FSC pursuant to this Agreement which is used to access an Account.

**"Controls"** are a set of authorization tools designed to assist you with managing purchases.

**"DIN"** means the driver identification number.

**"Financial Information"** means your financial statements including, at a minimum, an income statement for the applicable fiscal year and a balance sheet.

**"Fleet Contact Person"** means the person you select who is authorized to provide us with the information necessary to establish and/or manage your Account(s) and Cards.

**"We", "us", "WEX FSC"** and **"our"** refers to Wright Express Financial Services Corporation.

**"You"** and **"your"** refers to the entity or person whose Account is created under this Agreement.

2. ESTABLISHMENT OF ACCOUNT:  WEX FSC, at its sole discretion, may extend credit, establish Accounts and issue Cards under this Agreement.  Without notice we may modify, suspend or terminate your Account.  You agree that this Account will only be used for the purchase of products and services for business purposes and not for personal, family or household purposes.  Purchases of lottery tickets or other games of chance, gift cards, pre-paid cards or other cash equivalent charges are prohibited.  You shall adopt internal policies and controls to ensure that the Accounts are used strictly for business or commercial purposes.  You agree to pay for all charges on your Account according to the terms of this Agreement.

3. CREDIT LINE AND CAPACITY:  You agree that:  a) we may establish a credit line (limit) for your convenience; b) your Account without notice will not exceed your credit line; c) we may suspend your Account without notice if your Account balance exceeds your credit line; d) we may investigate your business and/or your personal credit capacity and credit history; and e) we may change your credit line without notice based on our evaluation of your creditworthiness and other factors.  You will be advised of your credit line if your Account is approved.  We are authorized to provide information about: i) you and your Account to credit reporting agencies, affiliates, lenders, banking examiners, auditors, entities who finance our business and others who may lawfully receive the information; and ii) your transactions to accepting merchants or their service providers so they can offer you discounts or other promotional campaigns.

4. FINANCIAL STATEMENTS:  You agree to furnish WEX FSC copies of your consolidated audited financial statements as soon as available, but no later than 120 days following the end of each fiscal year of your company.  The Financial Information shall have been prepared in accordance with generally accepted accounting principles, consistently applied, and shall be in accordance with the books and records of your company.  You shall provide, in a timely manner, such other current financial information as we may request.

5. BILLING AND PAYMENTS:  Your Account will be delinquent if you do not pay it in full within 26 calendar days of the billing date appearing on your invoice.  Certain customers, based upon our credit review, may be required to make payment in less than 26 calendar days on a cycle that we may establish for you.  In addition, certain customers may elect a shorter billing or payment cycle as offered by us.  If your payment due date falls on a non-Business Day, payment is due on the Business Day before the payment due date.  Delinquent Accounts will be subject to late fees (as described below), suspension, or termination of credit privileges, without notice.  All charges must be paid in full regardless of disputes.  Charges must be disputed in writing no later than sixty (60) days from the billing date or they will be considered final and binding.

6. LATE FEES:  Late fees will be assessed at an Annual Percentage Rate of 24.00%.  The periodic rate is based on your billing cycle.  The periodic rates are:

| Billing Cycle | Periodic Rate | Calculation of Periodic Rate |
|---|---|---|
| Weekly | 0.462% | 24.00% divided by 52 |
| Monthly | 2.00% | 24.00% divided by 12 |

The late fee will be calculated by determining the total balance due on the date your account becomes delinquent, as follows:  adding the total amount due on your Account on the payment due date together with any purchases posted to your Account from the end of the last billing cycle through the payment due date and subtracting from that amount any payments and/or credits entered during that period.  The total balance due will then be multiplied by the applicable periodic rate to determine your late fee.  In the event that the calculated late fee is less than ten dollars ($10.00), a minimum late fee of ten dollars ($10.00) will be charged.

7. APPLICATION OF PAYMENTS:  Payments will be applied first to unpaid late fees and then to the unpaid balance of each product or service purchased in the order of its purchase.

8. CHANGES IN TERMS:  You agree that we may change the rates, charges, and other terms described in this Agreement (including our Fee Schedule), as well as introduce new terms and fees (such as delinquency charges, insufficient funds charges and supplemental processing fees) unless prohibited by applicable law, provided you are given advance written notice by us except when advance written notice is not required pursuant to other provisions of this Agreement.  Any amendments to your Account will apply to the then existing balance of your Account to the extent permitted or required by applicable law.

9. PREPAYMENT:  You may pay your Account balance, or a portion of it, at any time without penalty.

10. DEFAULT:  If you:  a) default on this Agreement or any other lending agreement between you and us by not paying any payment when due; b) exceed your credit line; or c) breach any other term of this Agreement or any other lending agreement between you and us, then we may:  i) suspend or terminate your Account(s) and/or Cards; ii) demand immediate payment of the entire Account balance; and iii) start a lawsuit for collection of the Account balance, subject to any notice of default and right to cure required by applicable law.  To the extent not prohibited by applicable law, you agree to pay all collection costs, including reasonable attorneys' fees.

11. CARDS AND ACCOUNTS:  You request Cards from us to use according to this Agreement by individuals, or in connection with specific vehicles, to be identified to us.  All Cards will be valid through the expiration date listed on the Card unless the Card has been suspended or terminated.  We may issue renewal Cards prior to their expiration date.  You agree that you will destroy expired Cards or Cards for which a replacement Card has been issued.  All renewal Cards or any additional Cards you request will be subject to the terms of this Agreement as in effect at the time of that renewal or issuance.

You may ask us to:  a) issue additional Cards (or replacement Cards); b) suspend or terminate Cards; or c) change the authorized use or use(s) of Cards.  We may, in our sole discretion, suspend or terminate any Account or Card or refuse to authorize any charge, at any time.  Unless you report any errors in your Account information or Cards within three (3) business days of your receipt thereof, we are entitled to rely on that information for processing your Account.

You agree that this Agreement controls all charges made on your Account by you or any person who uses a Card or your Account.  It is your responsibility to notify us of your revocation of any person or user's authority to use or access your Account, Cards, or DINs.  You will remain liable to us for any charges until such time as we receive notice.  You agree that use of a Card and the applicable DIN will constitute authorized use for all purposes.  We have no obligation or responsibility to you in the

event that any merchant, entity or person refuses to honor a Card.  If you choose to leave a Card at a merchant for use by your drivers, then you are responsible for any unauthorized use of that Card and agree to pay for all charges made with that Card.  You agree to keep DINs confidential and to ensure that your employees do not disclose any DIN.  If any of your employees discloses a DIN or writes a DIN on a Card, then you are liable for any fraudulent use that may result even if the disclosure is inadvertent or unintentional.

**You will promptly notify us of the loss, theft, or unauthorized use of any Card or Account by telephoning us at 866-544-7059 or through our online system.** You agree to provide written confirmation of any notice if requested by us.

Subject to any limitations imposed by law, you will be liable to us for all unauthorized use of a Card that occurs before your notification of unauthorized use but you will not be liable for any unauthorized use that occurs after notification.

12. FLEET INFORMATION AND CHARGE CARDS:  The Fleet Contact Person, or another person or persons designated by the Fleet Contact Person, is authorized by you to:  a) provide us with the information necessary to establish and maintain your Account, Cards, and DINs; b) provide all fleet vehicle, driver and other information that we may request; c) receive all Cards and reports; d) receive other Account information we may provide; and e) select additional products and/or services that we offer.  You will provide us with advance written notice of any change in or removal of any Fleet Contact Person.  You will remain liable to us for any unauthorized use until you notify us of any change in or removal of any Fleet Contact Person.  We are also authorized to deal with any contact person with apparent authority to act on your behalf.

13. MANAGEMENT REPORTS AND DISCLAIMER:  As part of our products and services, we provide purchase reports, vehicle analysis reports and other management reports and information, in either paper or electronic format.  These reports may include information relating to your use of Cards based upon charges and information reported to us.  You are responsible for reviewing these reports for accuracy and completeness.  These reports will accurately reflect information provided to us by third parties.  We cannot guarantee the accuracy or completeness of those reports to the extent that third party information received by us and contained in the reports is inaccurate or incomplete.  You understand and agree that, regardless of any errors in the reports, you remain responsible and liable for any and all charges.

14. FEES, CHARGES AND ACCEPTANCE OF TERMS:  We will assess fees and charges in the amounts listed on the attached Fee Schedule.  Your use of your Account indicates your agreement to pay the fees and charges and your acceptance of all of the terms and conditions of this Agreement (which includes the Fee Schedule).

15. BULK, MOBILE, UNATTENDED, AND PRIVATE OR ONSITE FUELING:  If you choose to use your Cards for bulk, mobile, unattended and private or onsite fueling purchases, we will provide you with enrollment forms and you will be responsible for any charges for those services.  You also authorize us to report Account information to the fuel providers that you select.  You acknowledge and agree that we will not be responsible for any claims, losses or liabilities that you may suffer as a result of, or related to, the misuse of your Account information by your fuel providers or their agents.

16. DYED FUEL PRODUCTS:  You may purchase dyed special fuel using your Cards.  You acknowledge that all dyed special fuel purchases will be used exclusively for off-road purposes and according to all applicable laws governing its use.  You may be subject to fines or other legal action by governmental authorities for misuse or mishandling of dyed special fuel.  We will not be liable in any way for any misuse or mishandling by you of any dyed special fuel.  Upon request from applicable governmental authorities, we may provide information regarding your dyed special fuel purchases to them without further authorization from you.

17. ONLINE PRODUCTS:  Certain products and services offered to you by us may be accessed by you through the Internet.  Although we are using both passwords and data base security methods for our online products, security cannot be guaranteed.  We disclaim all liability for any security breaches of online communications or for any electronic, computer or other system failures.  We are not liable to any person for loss, liability or damages, including consequential or special damages, arising out of any security breaches or system failures or any other defect of the electronic online communication procedures, including loss due to data modification or destruction.

18. INTERNATIONAL USE OF CARDS (FOR UNIVERSAL CARDS ONLY):  Universal Cards issued to you for use by your United States based operations may be used in other countries.  By use of Cards in any country other than the United States you agree that you will:  a) be billed in US Dollars; b) receive reporting from us in English; c) accept the currency conversion fee as reflected in our Fee Schedule; and d) not distribute Cards to employees based in countries other than the United States.

19. CONTROLS:  You may request that Controls be applied to your Account.  The availability and effectiveness of Controls is dependent upon each merchant's adoption of card specifications and the information, including product codes, transmitted to us by them.  The product codes are assigned by each merchant, and as such, we have no responsibility for inappropriate product code assignment.  You understand and acknowledge that only transactions submitted to us for authorization are subject to Controls and that those Controls can only be enforced when the merchant provides sufficient information as part of the authorization.  In addition, some Controls do not work at island card readers.

We reserve the right to modify Controls when those Controls, in our opinion, are set at a level such that they are ineffective or not in accordance with the goals of the Controls program.  Default values will be assigned by us unless you make your own election(s) through our online product.  Additional important information related to Controls is also available online.  We shall not be responsible for the prudence of any particular Control level you select.  The existence and/or use of Controls does not affect your liability for unauthorized use of Cards.  You remain liable for transactions made using unreported lost or stolen Cards and/or Account numbers or DINs.  You also agree that you will review fraud control data provided by us, such as vehicle analysis reports, for the purpose of detecting fraud that occurs within Control parameters.

20. REPRESENTATION, WARRANTIES AND ACKNOWLEDGMENTS:  You represent and warrant to us that this Agreement is valid, binding and enforceable against you in accordance with its terms and, if you are a corporation or other entity, that this Agreement has been duly authorized by all necessary action of your governing body.  You agree to provide any evidence of corporate (or other organizational) existence and authorization that we may reasonably request.

As part of our commitment to customer service, our managers periodically will monitor telephone communications between our employees and our customers to ensure that our high quality service standards are maintained.  By accepting this Agreement, you hereby consent to such monitoring and recording of telephone communications.  You also agree to notify your employees who may be in telephone contact with our representatives that periodic monitoring of conversations will occur.

21. WARRANTY DISCLAIMERS AND LIMITATIONS ON DAMAGES:  EXCEPT AS OTHERWISE REQUIRED UNDER LAW, WE MAKE NO WARRANTY WITH RESPECT TO GOODS, PRODUCTS OR SERVICES PURCHASED ON CREDIT THROUGH US.  WE FURTHER DISCLAIM ALL WARRANTIES WITH RESPECT TO GOODS, PRODUCTS AND SERVICES PURCHASED WITH A CARD, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTY OF MERCHANTABILITY.

YOU ACKNOWLEDGE AND AGREE THAT WE WILL NOT BE LIABLE TO YOU FOR ANY LOSS, LIABILITY OR DAMAGES YOU SUFFER WHICH RESULT FROM, ARE RELATED TO, OR IN ANY WAY ARE CONNECTED WITH ANY FRAUD CONTROL OR PURCHASE RESTRICTION MEASURES WE ELECT TO IMPLEMENT FROM TIME TO TIME, UNLESS SUCH LOSS, LIABILITY OR DAMAGES ARE A DIRECT RESULT OF OUR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT IN IMPLEMENTING FRAUD CONTROL OR PURCHASE

RESTRICTION MEASURES WE HAVE EXPRESSLY AGREED IN WRITING TO UNDERTAKE FOR YOU.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, UNDER NO CIRCUMSTANCES SHALL WE BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES ARISING OUT OF ANY TRANSACTION, PRODUCT, GOOD OR SERVICE GOVERNED BY, OR ANY CLAIM RELATING TO, THIS AGREEMENT.  THIS LIMITATION OF DAMAGES, INCLUDES, WITHOUT LIMITATION, ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES ARISING FROM OR RELATED TO THE USE OR MISUSE OF ANY CARD OR YOUR ACCOUNT.  FURTHERMORE, OUR LIABILITY FOR ANY ACTUAL DAMAGES OR AMOUNTS DUE AS A RESULT OF NOT MEETING ANY EXPRESS OR IMPLIED WARRANTIES MADE BY US TO YOU IS LIMITED TO THE CARD FEES PAID BY YOU DURING THE YEAR PRIOR TO YOUR REQUEST FOR CANCELLATION OR REFUND DUE TO OUR NOT MEETING SUCH GUARANTEES.

22. ASSIGNMENT:  You may not assign this Agreement for any reason, or any interest, payment, or rights under this Agreement without our prior written consent.  We may, in our sole discretion, assign this Agreement, transfer any right or delegate any duty of performance under this Agreement without further notice to you.  The person or entity(ies) to whom we make any such assignment are entitled to all of our rights under this Agreement, to the extent that those rights were assigned.

23. COVENANTS:  You will provide us with at least thirty (30) days advance written notice of:  a) any action by you to consolidate, merge or sell a substantial part of your assets; b) your intent to undertake a change in your legal structure; or c) removal or change of any guarantor on your Account.  You will provide us with prompt written notice if any guarantor of this Agreement is rendered incapacitated or is unable to perform for any reason.

24. CANCELLATION:  We and you have the right to cancel this Agreement, Accounts, Cards or DINs at any time without advance notice.  You remain obligated to pay for all purchases made before cancellation.  You agree to return all Cards to us upon notice of cancellation.  We may, at any time, elect to terminate products or services described in this Agreement or on any enrollment form upon fifteen (15) days advance written notice to you.

25. PARTIES TO THE AGREEMENT:  This is an agreement between you and us and no other entity shall be deemed a party to this Agreement or third-party beneficiary of it, except as provided in Section 23.

26. SEVERABILITY:  In the event any provision of this Agreement is held to be invalid or unenforceable under any law, rule or regulation of any governmental agency (federal, state or local), that fact will not affect the validity or enforceability of any other provision of this Agreement.

27. REQUIREMENTS OF A WRITING:  You agree that any electronic image of signed originals of your Agreement, your Account Application and product enrollment forms is binding as an original.  You further agree that additions, updates, and deletions of vehicles, drivers, and Fleet Contact Persons placed by telephone or electronically, and accepted by us, are binding on you.

28. ENTIRE AGREEMENT:  This Agreement, including the Fee Schedule, the Account Application you filed with us, any agreements which secure or guaranty your obligations under this Agreement, any electronic payment agreement, enrollment forms and any amendments, modifications, substitutions or replacements of any of those documents, is a final expression of the credit agreement between us and you and may not be contradicted by evidence of any alleged oral agreement.  Except as is expressly permitted in this Agreement, no modification of it is effective unless in writing and signed by an authorized officer of you and us.

Any terms different from this Agreement or contradictory to this Agreement that are set forth in a Purchase Order or other communication are expressly rejected and shall under no circumstances modify the terms of this Agreement.

This Agreement is governed by and construed in accordance with federal law and the laws of the State of Utah (without reference to choice of law rules).  Any judicial action brought under or involving the subject matter of this Agreement shall be brought exclusively in the courts of the State of Utah located in Salt Lake City or the U.S. District Court for the District of Utah, and the parties expressly consent to the exclusive jurisdiction of such courts for the resolution of any disputes under this Agreement.  Each party waives any objection to venue and any objection based on forum non conveniens in any such court.

29. USA PATRIOT ACT:  We comply with Section 326 of the USA Patriot Act which requires all financial institutions to obtain, verify, and record information that identifies each company or person who opens an Account.  We will ask you for your name, address, date of birth, or other applicable information to identify you.

30. DISCOUNTS/REBATES:  You may be offered discounts and/or rebates by participating in this card program from time to time.  Such discounts and/or rebates may be suspended, modified or discontinued at any time without prior notice and may not be applicable to all fuel types.  In addition, certain conditions in order to earn or receive the rebate or discount such as but not limited to maintaining your account in good standing will apply and be provided to you when such offers are made.

## Fee Schedule

Your use of your Account indicates your acceptance of this Business Charge Account Agreement and this schedule of fees and charges.

| | |
|---|---|
| Set-up Fee | $40.00 |
| Monthly Card Charge | $2.00 per card |
| Replacement Card | $2.00 per card |
| International Currency Conversion Fee | 1% of the total transaction value |
| Reproduced Reports | $25.00 per request |
| General Research Fee | $15.00 per hour |
| Expedited Shipping Fee | Cost Varies* |
| Returned Item Fee (such as NSF/ACH) | $20.00 |

*The expedited shipping fee varies based on the options chosen by you.

Pricing for additional products and services is available upon request or reflected on the enrollment forms or in the terms of use that you must agree to in order to receive the additional products and services.

**If you have any questions about any of the above, please call**
Customer Service, toll-free at 866-544-7059.

# Global-Fleet Fuel Card Fleet Information

Company Name: _____    Limit punctuation to the following characters: | / | - | . | & | ' |

## DRIVER INFORMATION – List *all* drivers who will be using fleet cards.

| | **Last**<br>12 character limit | **First**<br>10 character limit | **M.I.** | **Driver ID** (No duplicates)<br>Leave blank if you want us to assign<br>4 digits |
|---|---|---|---|---|
| SAMPLE: | *Smith* | *John* | *A* | *1234* |
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

## VEHICLE INFORMATION – We will issue a card for each vehicle you list.

- Please check one of the following restriction options.*
  - ☐ Emboss selected cards with "Fuel Only" (See Fuel Only column)
  - ☐ Emboss all cards with "Fuel Only"
  - ☐ Do not restrict any cards with "Fuel Only"
- Select *ONE* of the following columns below to appear on the second line of your cards.
  - ☐ Vehicle Description
  - ☐ Customer Vehicle ID
  - ☐ License Plate
  - ☐ None

| | **License Plate**<br>8 character limit | **State**<br>2 char | **Vehicle Description**<br>(required)<br>17 character limit | **Fuel Only***<br>⊠ = Yes | **Customer Vehicle ID**<br>(optional)<br>17 character limit |
|---|---|---|---|---|---|
| SAMPLE: | *12345678* | *ME* | *03 Chevy Mini Van* | ☐ | *Unit 123* |
| 1. | | | | ☐ | |
| 2. | | | | ☐ | |
| 3. | | | | ☐ | |
| 4. | | | | ☐ | |
| 5. | | | | ☐ | |
| 6. | | | | ☐ | |
| 7. | | | | ☐ | |
| 8. | | | | ☐ | |
| 9. | | | | ☐ | |
| 10. | | | | ☐ | |

* Please note that purchase authority restriction may not be enforced if electronic authorization is inoperative...e.g., during system outage.

**X** _____

Signature of person completing form            Print                        Date

# Fax Your Application/Card Order to: 877-900-2892

GFF.FLEETDATA (07/11)

## DEPOSIT AGREEMENT

THIS AGREEMENT is made by and between **Wright Express Financial Services Corporation ("WEX FSC")**[1], a Utah industrial bank with a place of business at 7090 Union Park Center, Suite 350, Midvale, UT 84047 and _____ _____ with a place of business at _____ (the "Customer") and it shall become effective as of the date set forth below.

**WHEREAS**, the Customer intends to make credit card purchases using a WEX FSC issued charge card; and

**WHEREAS**, WEX FSC has agreed to establish or has established a credit line (the "credit line") for Customer on the condition that the Customer deposit cash collateral with it to be held by WEX FSC as security for any and all obligations owing by the Customer to WEXFSC arising on or after the date hereof.

**NOW, THEREFORE**, the parties hereto agree as follows:

1. The Customer shall deposit with WEX FSC the sum of $_____ (the "deposit"), the receipt of which is hereby acknowledged and the Customer does hereby grant to WEXFSC a security interest in said deposit and in all credits or other amounts owing from WEX FSC to the Customer, all in order to secure any and all obligations owing by the Customer to WEX FSC arising on or after the date hereof.

2. WEX FSC shall record the deposit and any additional deposit on its books, but shall not be required to segregate the sum from its other funds.  WEX FSC may, at its sole discretion and without notice, apply said deposit and any additional deposit, or so much thereof as is necessary, to satisfy any obligations including any outstanding account balances arising on or after the date hereof from the Customer to WEX FSC.  WEX FSC shall also have a right to set off with respect to any credits or other amount owing by WEX FSC to the Customer.

3. If at any time the Customer ceases to become a WEX FSC card holder, and all of the Customer's accounts have been paid in full and no further amounts are owed from the Customer to WEX FSC, then the remaining deposit amount shall be returned by WEXFSC to the Customer.

4. The Customer agrees that it will pay amounts owed for credit card purchases made using a WEX FSC issued charge card as such amounts become due and in accordance with credit terms established from time to time by WEX FSC.  Nothing herein contained shall relieve the Customer of its obligation to make such payments as they come due.

5. This Agreement shall be governed by and construed in accordance with federal law and the laws of the State of Utah (without reference to choice of law rules).

6. This Agreement sets forth the entire understanding and supersedes any previous understandings or agreements, written or oral, between the parties relating to the subject matter hereof.  This Agreement may be modified only by an agreement in writing signed by both parties.

**By signing this Deposit Agreement you are indicating that you have the authority to bind the Customer to this Deposit Agreement and to the terms contained herein.**


**CUSTOMER NAME:** _____

**Customer's Physical Address:** _____

**Customer's Telephone Number:** _____

**Authorized Signature:** _____ **Printed Name:** _____

**Title of Signatory:** _____ **Date:** _____


[1] References to WEX FSC in this Agreement are also intended to refer to any entity to whom WEX FSC assigns its rights as allowed under any credit agreement between the parties.

**For Internal Use Only:**

| Account Number(s) | | |
|---|---|---|

DEP.AGR (4/10)

**Global-Fleet**

# Wire / ACH Transfer Instructions

Account Name:            Wright Express Financial Services Corp

Account Number:           4539508

Receiving Institution:        Harris Bank

Address:              311 West Monroe, Chicago, IL 60606

Telephone Number:         (312) 461-3036

ABA / Routing Number:       071000288

Reference:

 **BANK**

# Existing WEX Bank Customer
# MasterCard® Account Application

Please read the following information before completing this form.  Customer requests additional accounts on the WEX Bank ("Issuer") IssuerMasterCard program.  By signing below, you acknowledge that: 1) you authorize Issuer to check with credit reporting agencies, credit reference and other sources we deem appropriate in investigating the information given; 2) you agree the terms of use of the account and/or card(s) shall be governed by the MasterCard® Commercial Charge Card Program Agreement (the "Agreement"); 3) the person signing below is either a proprietor, general partner or  officer of the company with authority to enter into contractual agreements;  4) you shall provide financial statements for the last two (2) years; 5) Issuer may review the personal credit of the undersigned if this application is for a partnership or a proprietorship to make a credit decision and a consumer report of the undersigned may be obtained. Direct inquiries of employers and businesses where the undersigned maintains accounts may also be made; and 6) in the event you do not meet your obligations under the Agreement, Issuer may report your liability for and the status of the account to credit bureaus and others who may lawfully receive such information.

IF THIS APPLICATION IS NOT COMPLETELY FILLED OUT, THERE COULD BE A DELAY IN PROCESSING THE APPLICATION.

**Company:** GTL USA Inc.                **Parent Company (If subsidiary):** GTL Limited

**Physical Address:** 5200 Tennyson Parkway, Suite # 200,
(Please note that a PO Box cannot be accepted)

**Tax ID:** 262 - 125 - 604

**City:** Plano                                              **State:** TX    **Zip:** 75024

**Mailing Address (if different):** _____ **City:** _____ **State:** ___ **Zip:** _____
**Website:** _____          **Ownership:** ☐ Public ☒ Private

**Number of Cards Requested If applicable:** 2         **Average Monthly Usage:** $75,000

**Program Administrator:**    **Name:** Rajiv Kamat                **Title:** CFO

                **Email:** rajiv.kamat@gtlamericas.com        **Phone:** 972-464-0571

**Provide the account numbers or national ID for any current accounts funded by WEX Bank (for more than three accounts attach a separate sheet):**

1.  NA                          2.  NA                          3.  NA

**Select the program services in which you are interested:**

Subject to the terms of your MasterCard® Commercial Charge Card Program Agreement, Issuer shall arrange for issuance and the establishment of Accounts for you as set forth below:

A. **Purchasing Card**

☒ **Purchasing**          Account users may purchase goods and services generally.

☐ **Cardless**          Accounts may be established with no physical plastic or other purchase device. Access is primarily through the online product.

☐ **Central Travel**          Users may purchase transportation and costs are assigned to a centrally billed account.

B. ☒ **Cash Advance**          Account Users may obtain cash advances for business or commercial purposes through participating Automated Teller Machine ("ATM") networks and MasterCard member offices.

C. **Virtual Card Solutions**          Check options below if you are interested in learning more about our web products.  Additional terms apply and can be found online.

☐ **Purchase Log**          You must also select the Cardless option above to use this feature

☐ **Accounts Payable Direct**

**Select Billing Terms:** (subject to final credit approval)

☐ **Purchase Card** - Monthly Billing; Payment Due 15-days from date of invoice
☒ **Purchase Card** - Monthly Billing; Payment Due 25-days from date of invoice

**Indicate Percent of allocation of credit line:** (50%/50% split unless otherwise indicated and subject to final credit approval):

**Fleet account:**   50                          **MC account:** 50

**Select Billing Type:** (subject to final credit approval)
**Purchase Card**
☒ **Central billing**                    ☐ **Full Corporate Guarantee**

USE OF YOUR ACCOUNT:

(a) *Purchases* – Your cards and Account can be used to purchase or lease goods and services at any merchant who honors MasterCard® charge or credit cards.  You will owe us the total amount shown on each sales slip.  This amount will appear in the Purchases and Advances section of your monthly statement.

(b) *Cash Advances* – If you have elected the "Cash Advances" option, you and any Authorized User may obtain cash advances by presenting your card(s) at any at a participating bank or at automated teller machines (ATM) by utilizing the personal identification number (PIN) that you or the Authorized User selected or that was assigned by us.  "Cash Advances" also include certain "quasi-cash" transactions that we deem to be similar to obtaining cash.  Such quasi-cash transactions that we consider to be similar to cash transactions include, without limitation, the use of the card(s) and/or the account to obtain wire transfers, to purchase money orders, to purchase traveler's checks and to purchase foreign currency.  All cash advances will appear in the Purchases and Advances section of your monthly statement.

(c) *Currency Conversion on Foreign Transactions* – MasterCard will convert any purchase or cash advance made in a foreign currency into a U.S. dollar amount before the transaction is posted to the account or any sub-account.  The exchange rate between the transaction currency (the foreign currency) and the billing currency (U.S. Dollars) used for processing international transactions is a rate selected by MasterCard from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate MasterCard itself receives, or the government mandated rate in effect for the applicable central processing date, in each instance, plus or minus any adjustment determined by us.

INFORMATION SHARING DISCLOSURE: Issuer or its affiliates may, to the extent allowed by law, share information disclosed by or generated as a result of this application with each other, and with merchants accepting the card as well as MasterCard International. In addition, information regarding your transactions may be provided to accepting merchants or their service providers to facilitate discounts or other promotional campaigns of interest to you.

On behalf of your business, you represent that your business is a valid business entity; and that you are an authorized representative of the business with authority to enter into contractual agreements. You certify that all information provided in the Application is complete and accurate and you agree to be bound by the terms of the governing credit agreement to be provided to you upon credit approval. You may be required to supply balance sheet, income statement, and change in cash flow statement for the past three years if your organization is not publicly traded.  In addition you understand that the Issuer may require a guarantee, letter of credit, surety bond, or other acceptable form of security in order for you to receive credit.  You also understand that credit on this Account, once approved, will be extended by Issuer and there is no binding contract until the Issuer approves your application for credit with your company.

**Authorized Representative:** _____    **Print Name:**  Rajiv Kamat

**Title:**  CFO _____    **Phone:**  972-464-0571

**See terms and conditions on page 3.**

**Fax completed and signed form to 1-801-269-8709**

| For Office Use Only | Opp #: | Sales Code: | Coupon Code: |
| --- | --- | --- | --- |
| | Site Visit Date: | Sales Rep: | Acct#: |





GTL USA

# 2013
# National Partnership Agreement

## Extended Stay Hotels

Chris Baldwin

**Chris Baldwin, Regional Account Director**

**610.405.6774**

**cbaldwin@extendedstay.com**

**980.335.3193**

1/28/2013

    

extended
**STAY AMERICA**

January 28, 2013

Marylou Colarossi
Director, Program Management
GTL USA
702 Lisburn Road, Suite C
Camp Hill, Pa 17011
USA
**marylou.colarossi@gtlamericas.com**
717.975.3920

Dear Marylou:

Thank you for choosing Extended Stay America Hotels for a national lodging partnership!

We are excited to partner with GTL USA and are confident that we will meet and exceed the accommodation needs of your travelers.

Extended Stay Hotels (ESH) currently includes five (5) brands:

| | | |
|---|---|---|
| *Extended Stay America* | *Homestead Studio Suites* | *StudioPLUS Deluxe Studios* |
| *Extended Stay Deluxe* | *Crossland Economy Suites* | |

ESH is the largest mid-priced extended stay lodging company in North America. We offer your travelers nearly 700 hotels across the United States and select locations in Canada. And, we are still growing. That's more than five times the size of any other mid-priced extended stay hotel chain, so that gives us the opportunity to offer you the most locations at the best prices in North America. We look forward to a mutually beneficial and long lasting partnership with GTL USA.

In early 2013, ESH will be making some changes – and we'll be known as **Extended Stay America**. In addition to a new logo, we're making improvements across the country and redefining what a great hotel value should be. From the big cozy recliners to the sleek new flooring, our many newly refreshed rooms at renovated hotels are the perfect mix of style and comfort. Other hotels are receiving key elements such as improved lighting, new bedding and flat screen televisions throughout 2013.

**TRAVELER BENEFITS – Each one of our hotels offers**

- FREE in-room Wi-Fi
- Fully-equipped kitchens in every room
  - Kitchens consist of full-size refrigerator, microwave, stovetop and toaster
  - Dishes, cooking and dining utensils are also provided
- Complimentary grab-and-go breakfast *(coming to every ESA location in January 2013)*
- Superior service and consistency at all locations. ESA is among the top 1/3 for customer service in the hospitality industry *Source: Medallia - August 2012*

- Unlimited local phone use and personalized voicemail w/ remote retrieval
- Housekeeping and guest laundry facilities
- Pet-friendly rooms (nominal fee)
- Productive and ample workspace for an ideal office on the road
- In-room coffee maker, iron and full-size ironing board
- Select locations have access to a local health facility or a fitness center on site



Extended Stay Hotels National Partnership – 2013
November 12, 2012



## PREFERRED RATES FOR GTL USA

Extended Stay Hotel's pricing strategy ensures you receive the best value in each market. This means GTL USA will receive an even greater level of discount due to our partnership, saving your company travel dollars.

Extended Stay Hotels is pleased to confirm a preferred rate plan for GTL USA which provides the following discounts:

| FROM DATE TO DATE | | |
| --- | --- | --- |
| **LENGTH OF STAY** | **PERCENTAGE DISCOUNT** | **RATE TIER** |
| 1-6 Night(s) | 8% | Daily Rate |
| 7-29 Consecutive Nights | 8% | Weekly or Bi-Weekly Rate |
| 30+ Consecutive Nights | 8% | Monthly Rate |

Rates are based on a percentage discount from the regular rate offered for each length of stay for each room type. All room rates are net, non-commissionable and are quoted exclusive of appropriate state and local taxes. Preferred rates are valid through December 31, 2013.

These rates are offered on a Last Room Available basis. The discounted rate will be available any time that the hotel has rooms available for the requested stay.

We would be delighted to discuss any number of our locations in markets with large, recurring volume.

## PARTNERSHIP BENCHMARKS

This partnership is based on our expectation that GTL USA will promote Extended Stay Hotels as a **Preferred Supplier** for long term lodging.

The preferred rates are based upon anticipated production of $213,500.00 in room revenue with Extended Stay Hotels on an annual basis to maintain this discount. Tracking will be maintained and analyzed on a quarterly basis. We will review room night consumption and guest service satisfaction each quarter to ensure the partnership is beneficial to both GTL USA and Extended Stay Hotels. If anticipated production has not been met each quarter, or if it appears that the annual production will not be met before the end of the term, Extended Stay Hotels may terminate this agreement upon notice and a new rate may be negotiated going forward based upon actual production.

## RESERVATIONS

We will make every effort to accommodate your booking preferences. Options include:

- *Website:* **www.extendedstayhotels.com**
  Hotel reservations can be made with the Company Code established specifically for GTL USA. Your company code will be GTL.

- *Toll Free Central Reservations (1-800-EXTSTAY):*



Extended Stay Hotels National Partnership – 2013
November 12, 2012

Each guest must identify themselves as an employee of GTL USA and supply an assigned 3 letter Special Rate Plan code in order to receive the preferred discount.  The assigned 3 letter Special Rate Plan Code for GTL USA is GTL.

- ***Travel Agents' GDS (Global Distribution System):***
  We can load rates into any GDS and/or centralized hotel booking tool using your specific instructions.  Reservations may be made through the GDS by agents authorized to make reservations for your company. The chain code for all Extended Stay Hotel Brands is **EA.**  Please provide rate loading information upon signed agreement.

- ***Hotels Direct:***
  Rates can be accessed by calling the hotel direct and identifying themselves as an employee of GTL USA.

- ***Single Point of Contact:*** As your national account representative, Chris Baldwin is your primary contact for Extended Stay Hotels, and is available to assist with any special requests, large scale opportunities or group bookings.  Contact information is listed on the first page of this agreement.

**PAYMENT** –All guestroom charges will be the responsibility of the individual traveler.  Individuals will be responsible to provide a credit card to guarantee reservations and will also be required to present a method of payment upon check in.
OR
GTL USA may use national direct bill privileges, pending approval.  Direct bills will be established for room and tax for each room specified.  Direct bill invoices will be sent weekly and will be due upon receipt. All incidental charges are the responsibility of the individual unless otherwise specified by an authorized GTL USA representative.  Travelers will be required to present individual credit cards for incidentals.

With regard to taxes, each municipality in each state has their own tax exemption laws for extended lengths of stay.  We will follow the local laws regarding tax exemption and tax refunds when necessary.

**TERMINATION**
If at any time during this agreement, either party wishes to terminate any single location or the agreement in its entirety, a written notice should be sent 60 days in advance.  This agreement will terminate immediately on the liquidation, dissolution, or filing of bankruptcy by GTL USA or delinquency in payment of the account.

**GENERAL INDEMNIFICATION:**
Unless caused by or arising from the gross negligence of the indemnitee, its employees, or its agents, each party agrees to defend, indemnify, and hold harmless the other party, its affiliates, and their respective directors, officers, employees and agents from and against any and all claims, actions, damages, or other liabilities (including reasonable attorneys' fees, court costs and other costs of defense) involving: (i) tangible property owned or in the care, custody or control of indemnitor; (ii) bodily injury (including death) suffered by indemnitor's employees; and (iii) third party bodily injury (including death) and third party tangible property damage.

Extended Stay Hotels National Partnership -- 2013
November 12, 2012

**LIMITATION OF LIABILITY:**
In no event shall a party be liable to the other party for loss of business or profits, or for any other special, indirect, incidental, punitive, exemplary, or consequential damages whether or not such damages were foreseeable or a party was advised of the possibility of such damages. This article is not intended to supersede or modify the express remedies of a party as specified in sections of this agreement that pertain to block attrition or cancellation of room blocks. The terms and conditions set forth in this article shall survive the expiration or termination of this agreement.

**ASSIGNMENT**
This agreement may not be assigned or transferred by GTL USA without the written permission of Extended Stay Hotels.

**ENTIRE AGREEMENT**
This agreement constitutes the entire agreement between the parties and supersedes any previous communications, representations or agreement, whether written or oral. Any changes to this agreement must be made in writing and signed by authorized representatives of each party.

**ACCEPTANCE**
Except for terms described above, all other issues relating to reservations and stays, including check-in and check-out times, our right to deny accommodations, payment policy and cancellation policy, will be in accordance with our standard rules and policies. A copy of the standard rules and policies are available at your request.

We are very pleased to have the opportunity to welcome guests of GTL USA to Extended Stay Hotels. If you have any questions regarding this agreement or if I can be of assistance at any time, please contact me directly.

In order for the preferred rates to go into effect, this agreement must be signed and faxed back to 980.335.3193, by February 1, 2013

Sincerely,                                              Accepted and agreed to by:

_____                    _____
                                                          Signature

Chris Baldwin
Regional Account Director
Extended Stay Hotels                             _____
cbaldwin@extendedstay.com               Marylou Colarossi
610.405.6774                                          GTL USA

                                                          _____
                                                          Date   02/25/2013.

WELLS FARGO · **Products**

Regional Banking

Select a State >>>  Texas

Home   Purpose   Regions   Learning Paths   **Products**   Sales Training & Tools   Help

Teamworks

**New Search   Consumer   *Business***   Additional Product Information:   Online Banking   Bill Pay

Lines/Loans

<---- View another Lines /Loans product ---->

Product Categories/Common Fees

<--- View another category --->

## Texas --> Business

### Secured BusinessLine Line of Credit

*Revised: 10/17/2014*

| | |
|---|---|
| **Account Description** | A secured revolving line of credit that provides businesses with supplemental cash flow for covering short-term business expenses. Secured by a Wells Fargo savings or certificate of deposit (CD) account, this product is ideal for customers who want to preserve savings while having access to working capital. |
| **Loan Amount** | Minimum line size $5,000 up to $100,000. |

- Actual line amount is 95% of the collateral account.
- Example: $20,000 collateral = $19,000 line

| | |
|---|---|
| **Collateral** | Secured by a Wells Fargo Certificate of Deposit (CD) or Savings account. |
| **Interest Rate** | Rates are variable and based on Wells Fargo's Prime Rate plus a spread determine upon approval. The current rate spread is Prime + 1.00%- 5.00% |
| **Fees** | Opening Fee: |

- $150

Annual Fee:

- $50 per year beginning the second year after the account is opened.

Late Fee

- $25 if the previous statement balance was less than $100
- $39 if the previous statement balance was greater than or equal to $100 AND the first late payment occurred within the previous 12 billing cycles
- $50 the previous statement balance was greater than or equal to $100 AND the second late payment, or more, occurred within the previous 12 billing cycles

Overlimit Fee:

- No overlimit Fee

Returned payment Fee

- $29 for each returned payment

Overdraft Protection Transfer
Overdraft fees are assess based on the amount of the transfer:

- Up to $50 - $12.50 fee
- $50.01 and up - $20.00 fee

Cash Advance Fee (Supercheks, Online transfer, Bill Pay, or Telephone Transfer)

- No transaction Fee

Cash Advance Fee (Over-the-Counter or ATM Transactions)

- 3% of the advance with a $10 minimum and no maximum.

Cash Advance Fee (Casino Gaming, Wire transfer, or other waver or lottery ticket)

- 4% of the amount of each transaction or purchase with a $10 minimum and no maximum.

Foreign Currency Conversion Fee

- 3% Conversion fee on the converted dollar amount of each transaction.

| | |
|---|---|
| **Grace Period** | None |
| **Repayment Terms** | Revolving, no fixed term. |
| **Minimum Payment** | New Ending Balance over $200: Fees + Finance charges +1% of the balance<br>New Ending Balance is less than $200, then the Current Payment Due is equal to the New Ending Balance. |
| **Payment** | By check, telephone transfer, online transfer, or scheduled transfer from any account at virtually any bank. |

**Methods**

**Additional Benefits**

- Line comes with up to 4 Secured BusinessLine Line of Credit cards, imprinted with the business name.
- Line can be accessed via phone, online, Superchecks, credit card and ATM.
- Chip Card Technology
- Eligible for Wells Fargo Credit Protection

Wells Fargo Phone Bank. Internal use only