THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| GTL (USA), INC. | § | CASE NO. 15-40248 |
| | § | |
| Debtor. | § | |
| | § | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' LIMITED OBJECTION TO DEBTOR'S EXPEDITED MOTION FOR AN ORDER (I) APPROVING SETTLEMENTS AND DISMISSAL OF THE CASE, OR, IN THE ALTERNATIVE, (II) APPROVING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL ASSETS, (A) APPROVAL OF BID PROCEDURES, (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) ESTABLISHING CURE AMOUNTS, (D) APPROVING THE FORM OF NOTICE, (E) SETTING HEARING DATES AND (III) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") for GTL (USA), Inc. (the "Debtor") files this *Limited Objection to Debtor's Expedited Motion for an Order (I) Approving Settlements and Dismissal of the Case, or, in the Alternative, (II) Approving Procedures for the Sale of Substantially all of Debtor's Assets, (a) the Approval of Bid Procedures, (b) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (c) the Establishing Cure Amounts, (d) Approving the Forms of Notice, (e) Setting Hearing Dates, and (III) Granting Related Relief* (the "Objection") and in support thereof respectfully states as follows:

## BACKGROUND

**A.     The Bankruptcy Case**

1.     On February 9, 2015 (the "Petition Date"), GTL (USA), Inc. (the "Debtor") filed its voluntary petition for relief under title 11, chapter 11 of the United States Code (the

"Bankruptcy Code"). The Debtor continues to operate its business as debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee or examiner has been appointed.

2. On March 6, 2015, the United States Trustee appointed the Committee.

3. On June 8, 2015, the Debtor filed its *Disclosure Statement* [Doc. No. 162] (the "Disclosure Statement") and its *Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Doc. No. 161] (the "Plan").

**B.     The Sale Motion**

4. On July 17, 2015, the Debtor filed its *Expedited Motion for an Order (I) Approving Settlements and Dismissal of the Case, or, in the Alternative, (II) Approving Procedures for the Sale of Substantially All Assets, (a) Approval of Bid Procedures, (b) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (c) the Establishing Cure Amounts, (d) Approving the Forms of Notice, (e) Setting Hearing Dates, and (III) Granting Related Relief* [Doc. No. 228] (the "Sale Motion").

5. By the Sale Motion, the Debtor seeks approval of either a sale to Emirates International Holding Limited LLC ("EIHL") via a structured dismissal of the Debtor's bankruptcy case (the "Structured Dismissal"), or a Bankruptcy Code section 363 sale of substantially all assets of the Debtor via an auction (the "Sale").

**C.     The Debtor's Financial Condition**

6. The Debtor's public filings in this case, including the Plan and the Monthly Operating Reports, demonstrate that the Debtor's financial condition is deteriorating rapidly. A simple review of the Plan projections (the "Projections") lays bare the severity of the situation. According to the Projections, the Debtor will come dangerously close to running out of cash in

or about September of 2015. Specifically, the cash is projected to dip down to $337,184 in that month. *See* Plan at Exhibit C.

7. The $337,184 projected cash amount, however, does not tell the whole story. The Debtor has deferred making payments under the post-petition facility agreement between the Debtor and its parent company GTL International, Ltd. *See* Plan at Exhibit B. To put it another way, if the Projections included these payments (which the Debtor believes are valid obligations), then the cash situation would be even worse than projected. Moreover, the Projections make a critical error by omitting professional fees and expenses after July 31, 2015. *See* Plan at Exhibit C (including professional fees in the line item "Extraordinary/Prior Period/Restructuring" and projecting no such expenses after July 2015).[1] The fact is that, relying on the Debtor's Projections, and contemplating the additional professional fees that absolutely will be required to move this case past July 31, 2015, the Debtor is slated to completely run out of cash on (or perhaps well before) the beginning of September 2015.

8. The Debtor does not propose (in its Plan or otherwise) any outside financing to provide a cushion to deal with the very real possibility that the Debtor will run out of cash. Moreover, evidence in this case has separately shown that the Debtor's survival has always been dependent on cash infusions from its parent entities and that such parent companies are either unwilling – or unable – to commit to providing such funding going forward.[2] The Debtor has not been able to find alternative financing.

9. In addition to the Projections, the monthly operating reports filed by the Debtor show a troubling downward trajectory, summarized as follows:

---

[1] The Committee has made the Debtor aware of this error.

[2] The Committee conducted a deposition of the Debtor's Senior Vice President Urmeet Juneja on June 25, 2015 in the context of the Committee's investigation of causes of action against GTL International, Ltd. and GTL, Ltd.

| Month | Doc No. | Net Revenue | Net Loss | Cash | A/R |
|---|---|---|---|---|---|
| February 2015 | 58 | $780,537 | ($221,920) | $1,438,569 | $3,936,919 |
| March 2015 | 118 | $634,537 | ($153,240) | $1,858,049 | $3,257,820 |
| April 2015 | 141 | $508,406 | ($615,256) | $3,343,454 | $1,766,523 |
| May 2015 | 197 | $412,703 | ($376,112) | $3,192,230 | $1,395,875 |
| June 2015 | 235 | $463,503 | ($375,842) | $2,952,607 | $1,404,386 |

10.     The Committee acknowledges that the Debtor's cash balance has increased since the Petition Date.  However, the increase in cash appears to have come principally from the liquidation of accounts receivable, which the Debtor valued at $5,028,557 on the Petition Date (as per the Schedules) and which had shrunk to $1,404,386 as of June 30, 2015.  *See* June Monthly Operating Report [Doc. No. 235].  In addition, while the cash balance as of the June Monthly Operating Report is $2,952,607, the Projections, when all costs are incorporated, demonstrate that the Debtor will likely run out of cash in August or September of this year.  In other words, using the Debtor's Projections, and correcting for the missing professional fees, it is clear that the Debtor will burn through all or substantially all of its cash reserves – constituting almost $3 million in cash – in a period of approximately three months.

11.     The Debtor acknowledges its need for funding and its inability to obtain such funding from its parent companies in the Sale Motion as follows:

> The Plan provides for the continued operation of the business with post-petition funding to be provided, on an as needed basis, from the Debtor's parent, GTL International ("GTLI") and/or GTL, Ltd. ("GTLL"), the ultimate parent (together, the "Parents"). . . After the Plan was filed, the Parents advised the Debtor that, due to their economic circumstances, they could not provide post-confirmation financing to the Debtor on the terms and conditions previously proposed.

Sale Motion at ¶¶ 7-8.

12. The Debtor further acknowledges its dire financial situation in its motion seeking to have the Sale Motion heard on an expedited basis [Doc. No. 229] (the "Motion to Expedite"). As set forth in the Motion to Expedite:

> The Debtor's business operations are at a seasonal phase that will result in a cash drop as much as $1.0 MM over the upcoming weeks. While the Debtor believes that its cash reserves will recover in the fall, the near and long-term ability of the Debtor to secure financing to weather its slow season and operate profitably going forward is uncertain at best. As such, it is a possibility that the Debtor will find itself without sufficient cash resources to operate as soon as August or September of this year.

Motion to Expedite at ¶ 6.

## LIMITED OBJECTION

### A. The Committee Supports the Sale of the Debtor on the Schedule Set Forth in the Sale Motion

13. The Committee supports the expedited sale process set forth in the Sale Motion. From the Committee's standpoint, the Debtor's deteriorating financial condition requires the Sale process to be conducted as quickly as reasonably possible. Under different circumstances, the Committee might support the Debtor's retention of an investment banker and/or seek more time to market the Debtor's assets for sale. In this case, however, the Debtor simply does not have the time or the money for a lengthy sale process. The Committee is aware that the Debtor's financial advisor (Dawn Ragan with Bridgepoint Consulting, LLC ("Bridgepoint")) is assisting with the Sale process and that both Ms. Ragan and Bridgepoint are experienced in such matters. The Committee's financial advisor is also assisting with identifying potential bidders. At the hearing on the Sale Motion, the Committee will put on evidence demonstrating that the on-going marketing of the Debtor's assets is reasonable under the circumstances. The Sale process is the best hope for creditors to recover in this case and should be vigorously pursued by the Debtor.

B. **The Committee Objects to the Debtor's Parent Companies Having Veto Power Over the Sale Process**

14. Paragraph 23 of the Sale Motion states that the Sale is purportedly "subject to the approval of the lenders of [GTL International ("GTLI") and GTL, Ltd. ("GTLL," collectively with GTLI, the "Parents")]. Currently, there is no agreement to the Sale by the Parents, nor is there any indication that they will support the Sale or agree to reduce their claims or defer any distribution."

15. The Committee strenuously objects to any suggestion that the Parents unilaterally will be able to determine whether the Sale goes forward. Providing the Parents with such power would create a direct conflict of interest and would supplant the business judgment of the non-debtor Parents with that of the Debtor. The Court should make clear to the Parents (and their lenders and any other party purporting to wield power over the Debtor) that the Debtor has fiduciary duties to its estate and it is the Debtor's business judgment that will govern whether the Sale is in the best interests of the Debtor's estate and, ultimately, the unsecured creditors in this case.

16. It is black-letter law that a "debtor in possession performing the duties of a trustee is the representative of the estate and is saddled with the same fiduciary duty to maximize the value of the estate available to pay creditors." *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 273 n.11 (5th Cir. 2012). Those fiduciary duties run to the estate and its creditors, and not to any other party. Any potential conflicts of interest are to be resolved in favor of the estate.[3] Moreover,

---

[3] It is sufficient in this case that the fiduciary duty to creditors is the rule under bankruptcy law for any debtor in possession. However, the Committee also notes that the Debtor is a Delaware corporation and Delaware law specifically provides that an individual who is an officer or director of both a parent and its insolvent subsidiary owes a fiduciary duty to the subsidiary's creditors, and a failure to satisfy that fiduciary duty will expose the officer or director to potential liability. *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 395-96 (S.D. Tex. 2008) (interpreting Delaware law); *see also In re Scott Acquisition Corp.*, 344 B.R. 283, 287-290 (Bankr. D. Del. 2006) ("The Delaware courts have recognized that directors who hold dual directorships in the parent-subsidiary context may owe fiduciary duties to each corporation" and that, upon the insolvency of the wholly owned

conflicts of interest between a debtor in possession and its corporate parent are considered so serious that the issue alone can be grounds for appointment of a Chapter 11 trustee. *See In re Euro-American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) (citing multiple cases where trustees were appointed to deal with inter-corporate disputes or conflicts of interest).

17. In the context of a sale of estate assets, a debtor in possession must determine whether there is a business justification for the sale. *See In re Cont'l Airlines*, 780 F.2d 1223, 1226 (5th Cir. 1986). This "business judgment rule" refers to whether the sale makes sense for <u>the debtor's business</u>, not whether it makes sense (or allegedly does not make sense) for the interest of other insider entities. This holds true even if the insider has a large claim in the case. *Cf. In re Copperfield Investments, LLC*, 401 B.R. 87, 96 (Bankr. E.D.N.Y. 2009) (holding that the paramount interest of creditors is used in determining whether to approve a settlement and that "even a creditor holding the overwhelming majority of claims in the case may [not] arbitrarily veto a settlement that otherwise satisfies the criteria for approval.").

18. In this case, the Debtor is acting as a debtor in possession and unquestionably has fiduciary duties to the Debtor's estate and the Debtor's creditors. Those duties include considering the interests of the Debtor's estate and its creditors over all other parties. Permitting the Parents to veto a Sale that otherwise would benefit the Debtor's estate would be providing the Debtor with a license to breach its fiduciary duties. For that reason, the Court should make clear that the sole consideration for whether a Sale will be approved in this case will be whether <u>the</u>

---

subsidiary, those directors "owe fiduciary duties to the subsidiary and its creditors."); *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 817 F. Supp. 2d 934, 942-43 (N.D. Tex. 2011) (interpreting Delaware law and noting that a director sitting on both sides of a transaction that adversely affects the subsidiary's ability to satisfy its obligations to its creditors gives rise to a plausible claim for breach of fiduciary duty).

<u>Debtor</u> – in the exercise of its fiduciary duties – approves such Sale based on <u>the Debtor's business judgment that the Sale is in the best interest of the estate</u>.[4]

19. To the extent that the officers and/or directors of the Debtor are incapable of making such a determination free from the influence of the Parents, the Court should, pursuant to Bankruptcy Code section 1104(c), appoint an examiner to oversee the Sale process. Such a remedy has been employed by other courts in similar circumstances. See Order Appointing Examiner to Examine, Negotiate and Supervise § 363 Sale of Assets entered in *In re Fontainebleau Las Vegas Holdings, LLC*, et al., copy attached hereto as **Exhibit A**.[5]

C. **The EIHL Structured Dismissal**

20. The Sale Motion at paragraph 14 states: "[t]he Committee has indicated that it will support the [EIHL] Settlement and Dismissal Motion." As the EIHL Structured Dismissal proposal is described in the Sale Motion, that statement is not correct. The Committee expressed to the Debtor its support for a deal with EIHL whereby $4.1 million would be made available to creditors as part of a structured dismissal where the $4.1 million is <u>not contingent</u>,[6] is <u>not net of administrative expenses,</u> and where the Parents' claims are not to be included in the $4.1 million to be distributed to creditors. The Debtor and EIHL originally proposed a deal where the funds

---

[4] The Committee's understanding is that the Debtor's sole director – Sukanta Kumar Roy – negotiated the EIHL deal and is also directing the Debtor with respect to the Sale. In addition to being the Debtor's sole director, Mr. Roy is also the Chief Operating Officer of GTLL. The Committee believes that the Debtor's officer (Urmeet Juneja) should make the business judgment decisions in this case (to the extent Mr. Juneja can act independently of the Parents) because the Committee seriously questions whether Mr. Roy is capable of putting the interests of the Debtor's estate over the interests of his employer.

[5] The Committee has not moved for the appointment of an examiner at this time because an examiner would be another professional in this case (i.e., another expense) who would have to get up to speed quickly to oversee the Sale process. The Committee is hopeful that the Debtor's officers and directors understand their fiduciary duties to the estate rather than to the Parent or any other party. However, if the Parent continues to insist that it can unilaterally veto the Sale, the appointment of an examiner may be unavoidable. Note that in the *Fountainbleu* case, the examiner was appointed *sua sponte* by the court. If the Parents in this case hereafter attempt to stop or impede the Sale process, the Committee will seek such an order on an emergency basis.

[6] The Sale Motion uses contingent language such as "up to" or "approximately" $4.1 million. See Sale Motion at ¶¶ 15,45. The Committee never expressed support for such a deal.

to be distributed would be contingent on the cash in the Debtor's estate as of a certain date. The Committee explicitly rejected that deal.

21. Moreover, the deal offered to the Committee was contingent on all creditors (especially AutOOpt Networks, Inc. ("AutOOpt")) agreeing to an allowed amount of their claims, thus permitting funds to be distributed to creditors in August 2015. EIHL makes clear in its written offer that the deal is contingent on a full release from AutOOpt of all parties, including the Debtor and the Parents. <u>As of the filing of this Objection, AutOOpt has not expressed such agreement or willingness to provide such releases</u>. The alternative would seem to be some sort of structured dismissal where a significant portion of funds are reserved for post-dismissal litigation with AutOOpt, thus delaying distribution to creditors for an indeterminate amount of time. The Committee does not support such a proposal and believes that a Sale is much more preferable.

22. In addition, the Committee objects to any structured dismissal that does not specifically set forth the terms of the settlements, the releases, and EIHL's binding obligation to fund the full amount of the $4.1 million. The proposed order attached as Exhibit B to the Debtor's Sale Motion includes none of these provisions. The Committee notes that the Debtor cites to *In re Jervic Holding Corp.*, 787 F.3d 173 (3d Cir. 2015) to support the Structured Dismissal. See Sale Motion at ¶¶ 51-57. Attached hereto as **Exhibit B** is a copy of the *Jervic* order dismissing the case as part of that structured dismissal settlement. The *Jervic* order makes clear that specifically enumerated provisions should be included as part of the dismissal roder.

23. For the foregoing reasons, the Committee does not believe that the Structured Dismissal is a viable option for this Debtor.

WHEREFORE, for the reasons set forth above, the Committee respectfully requests that this Court enter an order (i) approving the Sale process; (ii) overruling any arguments by the Parents that the Sale is subject to their approval; and (ii) granting the Committee such other and further relief to which it is justly entitled.

Dated: July 28, 2015.   Respectfully submitted,

**KANE RUSSELL COLEMAN & LOGAN PC**

By: */s/ Jason B. Binford*
    Jason B. Binford
    State Bar No. 24045499

3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jbinford@krcl.com; ecf@krcl.com

**ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 28, 2015, a true and correct copy of the foregoing Objection was served on all parties receiving ECF Notification in this case.

                                          /s/ *Jason B. Binford*
                                             Jason B. Binford